## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| **GERRY WOOD AUTOMOTIVE, LLC** ) | |
| **EMPLOYEE BENEFITS PLAN and** ) | |
| **GERRY WOOD AUTOMOTIVE, LLC,** ) | |
| **individually and on behalf of all those** ) | |
| **similarly situated,** ) | |
| ) | **COMPLAINT** |
| **Plaintiffs,** ) | |
| ) | **CLASS ACTION** |
| **v.** ) | |
| ) | |
| **TEAM HEALTH HOLDINGS, INC., and** ) | |
| **AMERITEAM SERVICES, L.L.C.,** ) | |
| ) | |
| **Defendants.** ) | |

Plaintiffs, Gerry Wood Automotive, LLC and Gerry Wood Automotive, LLC Employee Benefits Plan, for their complaint against Defendants, Team Health Holdings, Inc. and Ameriteam Services, L.L.C. (collectively "TeamHealth"), state as follows:

## I.     NATURE OF THE ACTION.

1.     TeamHealth is a private equity-owned management company headquartered in Tennessee that staffs hospital emergency departments across the nation.  Over the last several years, TeamHealth has engaged in health care overbilling[1] causing harm to self-funded health insurance plans such as Plaintiffs' plan herein, and others similarly situated.  This lawsuit is

---

[1] *See United States ex rel. Hernandez v. Team Fin., L.L.C.*, No. 2:16-CV-00432-JRG, 2020 U.S. Dist. LEXIS 26608, *31, 2020 WL 731446 (E.D. Tex. Feb. 13, 2020) (denying motion to dismiss relator's complaint filed under the False Claims Act, 31 U.S.C. § 3729 *et seq*. alleging upcoding and billing fraud); *Celtic Ins. Co. v. Team Health Holdings, Inc*., No. 3:20-cv-00523-DCLC-HBG (E.D. Tenn.) (complaint filed Dec. 10, 2020 alleging *inter alia* systematic upcoding); *Emergency Care Services of Pennsylvania v. UnitedHealth Group*, No. 5:20-cv-5094 (E.D. Pa.), *see* ECF No. 37 (counterclaim alleging that TeamHealth engaged in upcoding on health insurance claims).

Case 3:21-cv-00441   Document 1   Filed 06/07/21   Page 1 of 29 PageID #: 1

brought to recover damages, restitution and/or injunctive relief with regard to the Defendants' improper healthcare services billing practices.

2.     During the statute of limitation period applicable to the claims herein,[2] TeamHealth provided staffing, operation, and billing services to emergency departments as an outside contractor, promising to increase efficiency and profitability in exchange for a share of department earnings. In connection with its staffing of emergency departments, TeamHealth regularly renders healthcare services to enrollees of group medical plans such as the Plaintiffs' self-funded group health plan whose enrollees, during the pertinent times and on various occasions, received emergency room healthcare services from TeamHealth staff. Unfortunately, Plaintiffs were overbilled by TeamHealth, thereby causing injury and leading to this claim. Furthermore, insofar as TeamHealth's uniform practices and policies caused overbilling which affected and injured numerous other self-funded plans, Plaintiffs bring the instant claim both individually and on behalf of a class of all similarly situated self-funded healthcare plans and payors.

---

[2] For Counts One and Two, alleging claims under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, the statute of limitations is four years. *See Rotella v. Wood*, 528 U.S. 549, 553 (2000); *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.,* 483 U.S. 143, 155-56 (1987); *Fraley v. Ohio Gallia County*, No. 97-3564, 1998 U.S. App. LEXIS 28078, *4 (6th Cir. Oct. 30, 1998); *Lehman v. Lucom*, 727 F.3d 1326, 1330-31 (11th Cir. 2013). For Count Three, unjust enrichment, a three-year period likely applies. *See Moore v. Westgate Resorts Ltd., L.P.*, No. 3:18-CV-00410-DCLC, 2020 U.S. Dist. LEXIS 216516, *35-37, 2020 WL 6814666 (E.D. Tenn. Nov. 18, 2020); *Precision Tracking Sols., Inc. v. Spireon, Inc.*, No. 3:12-CV-00626-PLR, 2014 U.S. Dist. LEXIS 92255, *9-12, 2014 WL 3058396 (E.D. Tenn. July 7, 2014); *Carter v. Jackson-Madison County Hosp. Dist*., No. 1:10-cv-01155-JDB-egb, 2011 U.S. Dist. LEXIS 157329, *5-11 (W.D. Tenn. Dec. 13, 2011); *Swett v. Binkley*, 104 S.W.3d 64, 67 (Tenn. Ct. App. 2002); *Keller v. Colgems-EMI Music, Inc*., 924 S.W.2d 357, 359-61 (Tenn. Ct. App. 1996). Further, Plaintiffs claim that tolling applies insofar as the Defendants made active efforts to conceal their misconduct. *See In re Estate of Davis,* 308 S.W.3d 832, 840-42 (Tenn. 2010); *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 463 (Tenn. 2012).

3. During the pertinent times, TeamHealth used two fraudulent schemes[3] to obtain overpayments from Plaintiffs and other similarly situated victims. The first was the "Mid-Level Scheme." Under it, TeamHealth overbilled for services provided by "mid-level" practitioners. The term "mid-level" refers to non-physician providers such as Physician Assistants ("PAs") and Nurse Practitioners ("NPs"). Under lawful billing practices, a mid-level's services are reimbursed for less of a price than those of a physician.

4. The appropriate rate payable for service rendered to a self-funded enrollee is associated with the relevant National Provider Identifier ("NPI") linked with the claim for reimbursement. Services rendered by a mid-level provider should be submitted under the mid-level's NPI, triggering a lower rate. Services rendered by a physician should be submitted under the physician's NPI, triggering a higher rate. However, TeamHealth, through its uniform corporate policies and procedures, and through its control over its subsidiaries and affiliated entities, systematically submitted claims for mid-level services under physicians' NPIs, triggering the higher (physician) rate when the lower (mid-level) rate should apply. TeamHealth intentionally engaged in this practice for a period of years within the applicable statute of limitations period.

5. Through its billing policies and practices, TeamHealth sought to conceal the Mid-Level Scheme by characterizing services as "split/shared." Such "split/shared" services occur when both a mid-level and a physician treat the same patient during the same visit, such that the

---

[3] *See United States ex rel. Hernandez v. Team Fin., L.L.C.*, No. 2:16-CV-00432-JRG, 2020 U.S. Dist. LEXIS 26608, *4-12, 2020 WL 731446 (E.D. Tex. Feb. 13, 2020) (summarizing the two relevant schemes); and *Celtic Ins. Co. v. Team Health Holdings, Inc.*, No. 3:20-cv-00523-DCLC-HBG (E.D. Tenn.), ECF No. 1, complaint filed Dec. 10, 2020, ¶¶ 8-17 (same). Plaintiffs do not seek to bring a claim for "balance billing" of individuals as alleged in *Fraser v. Team Health Holdings, Inc.*, No. 20-cv-04600-JSW (N.D. Cal.), see Class Action Complaint dated July 10, 2020, ¶ 20 (balance billing action brought by "uninsured" individuals).

services are split or shared between a mid-level and a physician. When this happens, the mid-level's services may be billed under the physicians' NPI at the higher physician rate. However, true split/shared visits at facilities staffed by TeamHealth employees almost never occur. In fact, TeamHealth requires mid-levels to treat patients alone, maximizing mid-levels' profitability. Then, TeamHealth requires its healthcare providers to falsify medical records to reflect a split/shared visit when none occurred.

6.     TeamHealth accomplishes its concealment, first, by requiring its mid-level providers to indicate on medical records that a physician was involved in each patient encounter, when, in fact, a physician never saw the patient.  Second, TeamHealth requires on-duty physicians to sign mid-level medical records, suggesting that the physician treated the patient. The result is a medical record that appears to indicate that a split/shared visit occurred. TeamHealth then sends these falsified medical records to a coding and billing employee who uses the falsified record to submit claims for payment under the higher physician's NPI. This results in the mid-level provider services being reimbursed at 100% of the physician's rate.  It may be viewed as a variation of an "upcoding"[4] scheme.

7.     The second unlawful overbilling scheme engaged in by TeamHealth was the "Critical Care Scheme." This too was an upcoding scheme.  TeamHealth billed for "critical care," which is the highest level of emergency treatment, when in fact critical care services were not rendered or medically necessary.   By so doing, Defendants submitted false claims through

_____

[4] "'Upcoding,' a common form of Medicare fraud, is the practice of billing Medicare for medical services or equipment designated under a code that is more expensive than what a patient actually needed or was provided." *United States ex rel. Bledsoe v. Cmty. Health Sys.*, 342 F.3d 634, 637 n.3 (6th Cir.  2003) (citing Bonnie Schreiber et al., Health Care Fraud, 39 Am. Crim. L. Rev. 707, 750 n.331 (2002)).

4

fraudulent billing to private payers. Because of the heightened skill and decision-making that critical care requires, private payers reimburse providers for critical care services at a higher rate than for ordinary emergency services. To capitalize on this upcharge, TeamHealth required its providers to (1) meet stated critical care quotas each month; (2) falsify critical care on patient medical records when the care they provided did not meet critical care requirements; or (3) perform and chart critical care services when they were not medically necessary. Using the false medical records, TeamHealth coding and billing employees submit claims for reimbursement for the higher critical care services rate reflected in the falsified patient chart.

8.      TeamHealth has employed both schemes through its billing policies and practices to cause private self-funded plans to overpay with regard to the services concerned. Through these schemes, TeamHealth fraudulently obtained monies from Plaintiffs and other self-funded plans during the time period within the statute of limitations for which it employed the schemes.

9.      During the pertinent times, administrators for self-funded plans used methods to determine amounts to pay TeamHealth that tracked payment methods used by the Centers for Medicare and Medicaid Services ("CMS") and the States with regard to how CMS and the States made payments under the Medicare and Medicaid programs. TeamHealth's schemes violated CMS rules and those used by self-funded plans. TeamHealth perpetrated its schemes for the purpose of generating additional profit. The schemes defrauded the Plaintiffs and similarly situated plans cumulatively of millions of dollars. Plaintiffs seek to certify a class under Fed. R. Civ. P. 23 and seek damages arising from TeamHealth's fraudulent schemes.

## II. PARTIES.

10. Plaintiff, Gerry Wood Automotive, LLC Employee Benefits Plan is an employee benefit plan under the Employee Retirement Income Security Act of 1974 ("ERISA"), *see* 29 U.S.C. § 1002(3).[5]

11. Plaintiff, Gerry Wood Automotive, LLC is a limited liability company organized under the laws of the State of North Carolina and with a principal office located at 525 Jake Alexander Boulevard South, Salisbury NC 28147, and is the plan sponsor of the plan.

12. Defendant Team Health Holdings, Inc. is a Delaware corporation with its principal place of business at 265 Brookview Centre Way, Suite 400, Knoxville, Tennessee 37919, and for jurisdictional purposes it is a citizen of Delaware and Tennessee. It may be served with process at its corporate office address or c/o its registered agent, Corporation Service Company, 2908 Poston Ave., Nashville, TN 37203-1312.

13. Defendant Ameriteam Services, L.L.C. ("Ameriteam") is a Tennessee limited liability company. Its sole member is Team Finance L.L.C., whose sole member is Team Health Holdings, Inc. AmeriTeam employs the executive officers and administrative leaders of TeamHealth; issues the policies that govern all TeamHealth entities, in conjunction with its ultimate parent, Team Health Holdings, Inc.; and provides operational direction and administrative

---

[5] Because the instant claims are premised on a dispute over a rate of payment, as opposed to a right to payment, they are not cognizable under ERISA. *See Emergency Care Servs. of Pa., P.C. v. UnitedHealth Grp., Inc.,* No. 5:20-cv-05094, 2021 U.S. Dist. LEXIS 12695, *14-15, 2021 WL 236122 (E.D. Pa. Jan. 25, 2021). This complaint concerns only the appropriate rates of payment on the claims, not whether a right to receive payment exists. *Compare id.* at *17-18 (citing complaint ¶ 46). *See also N. Jersey Brain & Spine Ctr. v. United Healthcare Ins. Co.,* No. CV 18-15631, 2019 U.S. Dist. LEXIS 206680, 2019 WL 6317390 (D.N.J. Nov. 25, 2019), *report and recommendation adopted,* No. 18-15631, 2019 U.S. Dist. LEXIS 212867, 2019 WL 6721652 (D.N.J. Dec. 10, 2019) (accord).

and support services to all TeamHealth entities. Its principal place of business is at the 265 Brookview Centre Way address. AmeriTeam is a citizen of Delaware and Tennessee. It may be served with process at its corporate office address or c/o its registered agent, The Prentice-Hall Corporation System Inc., 2908 Poston Ave., Nashville, TN 37203-1312.

14.     Defendants own and control a system of affiliated entities operating as and collectively referred to herein as "TeamHealth." TeamHealth is owned by a large private equity firm which acquired the enterprise in 2017 for $6.1 billion. TeamHealth among other things provides emergency room staffing and administrative services to hospitals through a network of subsidiaries, affiliates, and independent contractors, which operate in nearly all states and which TeamHealth refers to as the "TeamHealth System." TeamHealth designed the complex structure of the TeamHealth System to avoid state laws that prohibit general business corporations from practicing medicine, employing doctors, controlling doctors' medical decisions, or splitting professional fees with doctors, aka, the corporate practice of medicine. TeamHealth deploys numerous local subsidiaries and affiliates with varying names intentionally to efface its own involvement in the relevant practices.

## III.    <u>JURISDICTION AND VENUE.</u>

15.     This Court has diversity jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs, and under 28 U.S.C. § 1332(d), because this is a class action in which at least one Plaintiff or class member is a citizen of a different State than at least one Defendant and the amount in controversy is over $5,000,000. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the Plaintiffs' claims arise under federal

law and under 18 U.S.C. § 1964(c) in that this action alleges violations of RICO.  This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

16.    This Court has personal jurisdiction over Defendants because they are located in and conducted relevant business activities in the State of Tennessee during the pertinent times.

17.    Venue is proper in the Middle District of Tennessee pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events giving rise to this Complaint occurred in this district; and because the Defendants transact business in this district, including doing business with emergency room departments and hospitals in this district in the putative class.

## IV.    DETAILED FACTS.

### a.    Background on TeamHealth.

18.    TeamHealth has entered into arrangements with numerous hospitals to replace local emergency room practice groups with TeamHealth's outsourcing enterprise. TeamHealth has staffed the emergency departments with ER doctors and physician's assistants under contract with TeamHealth, and it has billed payers for the services that these contractors provide.

19.    After TeamHealth's healthcare contractors provide a service to a patient, an administrative group at TeamHealth's corporate offices creates a health insurance claim by converting the medical record of TeamHealth's healthcare contractors into a health insurance claim. TeamHealth sends the claim to applicable payers including insurers, third-party administrators ("TPA") of self-funded plans, CMS or directly to the patient.

20.    TeamHealth's healthcare contractors who treat the patient do not see the insurance claims that TeamHealth creates, even though the claim is submitted in their name. Nor do they receive the money that TeamHealth collects.  Rather, TeamHealth has the money sent directly to

8

TeamHealth. Generally, TeamHealth classifies doctors and physician's assistants as "independent contractors" and pays them a fixed hourly fee. Using this scheme, TeamHealth is able to keep most of the money that its doctors and physician's assistants generate.

21. Payers do not see the medical records generated by TeamHealth's healthcare contractors. Instead, TeamHealth generally only sends medical billing codes and minimal other data to them. This information asymmetry is ripe for fraud, and TeamHealth has exploited it.

22. After TeamHealth convinces a hospital to "outsource" its emergency department to them, TeamHealth acts as an intermediary or gatekeeper between its healthcare contractors and the insurance companies that pay for their services. By acting as an intermediary, TeamHealth gets to bill for services performed by its healthcare contractors, but without any oversight.

23. TeamHealth's business model of being an intermediary between doctors and insurance companies causes doctors to be paid less. TeamHealth requires that all payments be sent directly to its corporate enterprise and keeps most of the payments. TeamHealth generally compensates its healthcare contractors at a fixed hourly rate that does not vary with the amount of excess payments TeamHealth extracts through its fraudulent billing schemes.

24. TeamHealth's individual healthcare contractors have no say in how much TeamHealth bills for their services. TeamHealth is the controlling intermediary between its healthcare contractors, on the one hand, and health insurance companies and patients, on the other.

25. TeamHealth has grown dramatically by acquiring other staffing/billing companies focused on emergency services. It has become one of the largest suppliers of outsourced healthcare staffing and administrative services for hospitals and other healthcare providers in the United States. TeamHealth operates nationwide, claiming to control hospital ER departments in 47 states,

9

and employs more than 18,000 healthcare contractors. TeamHealth's business model has generated significant profits, while many emergency rooms operate at a loss.

26.     When sending bills or providing services, TeamHealth usually does not use its own name; instead, it uses the names of its doctors or one of dozens of affiliates, most of which do not carry the TeamHealth name. Because TeamHealth uses many different entities and names to carry out its billing scheme, it has been able to mask the enormity of its enterprise and the sheer number of times it has carried out this unlawful scheme.

27.     TeamHealth structures its business operations to support its profit-maximizing strategy while disguising its participation in the corporate practice of medicine. The corporate practice of medicine doctrine prohibits corporations from practicing medicine or employing a physician to provide professional medical services. This rule promotes doctors working for themselves or with other doctors. It is intended to safeguard against the commercialization of the practice of medicine which risks putting financial incentives above patient care.

28.     TeamHealth seeks to circumvent state laws banning the corporate practice of medicine by creating and maintaining a large number of subsidiaries with various names. TeamHealth owns and operates a number of regional corporations, which in turn own subsidiaries that employ physicians as independent contractors. TeamHealth, the corporation, thus avoids directly employing doctors.

29.     At its headquarters, as noted, TeamHealth handles all of the medical coding and billing for work performed by its contractors around the country and uses uniform procedures across the enterprise designed to maximize revenue. It centrally controls its contractors nationwide by setting procedures for their work, for when and how much they work, and for what they are

10

paid, which usually is a fixed hourly rate. TeamHealth decides what codes to assign and how much to bill for its healthcare contractors' services. When TeamHealth's contractors complete their work with a patient, they submit medical records to headquarters, where TeamHealth engages in upcoding, overbilling, and aggressively collecting on bills.

30.     Coding is the process of converting a medical record into a billing code that accurately describes the medical service provided. Billing codes are used by CMS and private payers to pay for services. Standardized health care billing codes are called Current Procedural Terminology or CPT codes. TeamHealth determines what CPT codes to bill and sends claims containing these codes to payers when TeamHealth seeks payment for services.

31.     A central administrative group at TeamHealth's corporate offices in Tennessee handles the coding. They take the medical records generated by TeamHealth's healthcare contractors and decide what CPT code to bill for the work performed, regardless of the code used by the actual contractor. After reviewing the medical record generated by the contractor, a TeamHealth "coder" assigns the CPT codes. TeamHealth then submits the codes as a claim.

32.     TeamHealth's coders are administrative employees hired and trained by TeamHealth. They are not ER doctors and lack medical training. TeamHealth's doctors and physician's assistants do not see the codes selected by TeamHealth's coders, nor do the front-line workers see the insurance claim or billed amounts. They have no idea how TeamHealth bills their services even though the bills often are submitted in their names for services they rendered. They are not involved in assigning codes to the services they provide, and they are not consulted regarding what codes should be billed.

11

33.     One of TeamHealth's healthcare contractors described the situation: "As an emergency medicine physician, I have absolutely no idea to whom or how much is billed in my name. I have no idea what is collected in my name. This is not what I signed up for and this isn't what most other ER docs signed up for. I went into medicine to lessen suffering, but as I understand more clearly my role as an employee of TeamHealth, I realize that I'm unintentionally worsening some patients' suffering."[6]

34.     When seeking payment for services, TeamHealth does not provide actual medical records. Instead, it makes a representation that the CPT codes accurately describe the service provided by the TeamHealth contractor.  Because TeamHealth does not include medical records showing what services were provided, a payer cannot compare the codes on the claims to documentation regarding the services.  Because of the large volume of claims submitted and the laws prohibiting health insurance fraud, payers reasonably rely on TeamHealth's representations.

35.     In accordance with its usual practice, during the pertinent times, TeamHealth submitted health insurance claims without including the underlying medical records. Plaintiffs paid TeamHealth's claims in reliance on TeamHealth's representations.

36.     TeamHealth was able to conceal false information in its health insurance claims because (a) the healthcare contractor who provided the service does not see the health insurance claims that TeamHealth submits, (b) the patient who received the service does not see the health insurance claim that TeamHealth submits, and (c) TeamHealth typically does not provide medical records to payers. TeamHealth abused this information asymmetry to perpetrate fraud.

---

[6] See  https://www.propublica.org/article/how-rich-investors-not-doctors-profit-from-marking-up-er-bills.

37.     Every time TeamHealth submitted a health insurance claim to Plaintiffs, it certified that the information was true, accurate and complete and that the services listed were medically indicated and necessary to the health of the patient and were personally furnished. However, due to the improper scheme, often these certifications were false.

38.     Ultimately, TeamHealth's billing schemes have harmed patients. Inflated health insurance claims increase cost-sharing obligations and drive up the cost of health care. TeamHealth's improper practices have not only increased costs for patients but have also put upward pressure on premiums that cause the federal and state governments to spend more on cost-sharing subsidies and other taxpayer-funded support.

**b.      TeamHealth's Mid-Level Scheme.**

39.     As noted, during the pertinent times, TeamHealth has systematically billed for services provided by physician's assistants as if a doctor provided the service. In the healthcare industry, services provided by a physician's assistant are paid at lower rates than services provided by a doctor. Billing manuals, for example, will state that the insurer will pay for services provided by a physician's assistant at a percentage of what a physician is paid under the appropriate fee schedule for the same work. CMS has similar billing standards.

40.     By misrepresenting that a doctor provided the service, rather than a physician's assistant, TeamHealth submitted overbilled and fraudulent claims. On health insurance claims that TeamHealth submitted, it concealed the fact that a physician's assistant provided the service, and instead misrepresented that a doctor performed the service.

41.     Physician's assistants are qualified to provide certain ER services. TeamHealth contracts with physician's assistants and pays them on a physician's assistant pay scale. But

13

TeamHealth systematically billed their work under a doctor's name and at a doctor's rate. TeamHealth kept the extra money obtained through this fraud; the physician's assistants did not receive the benefit of TeamHealth's upcoding.

42. During the relevant times, Plaintiffs' enrollees in the self-funded plan have received emergency room medical care from one or more TeamHealth-supplied staff. Based on that care, TeamHealth submitted health insurance claims that Plaintiffs paid in reliance on the medical billing codes submitted by TeamHealth. However, TeamHealth falsely inflated the medical billing codes on one or more of the insurance claims that it submitted to Plaintiffs by its unlawful schemes.

43. TeamHealth's upcoded health insurance claims caused Plaintiffs to overpay TeamHealth for services performed by its doctors and physician's assistants. By upcoding, TeamHealth submitted fraudulent insurance claims, resulting in overpayments by Plaintiffs that TeamHealth secured through fraud.

44. Like Medicaid and Medicare, private health insurance companies and TPA-administered self-funded plans generally pay less for services provided by physician's assistants than for services provided by doctors. TeamHealth's fraud was discovered by one or more insurance companies and complained of by *qui tam* whistleblowers in ongoing litigation. In one such example, Celtic, an insurance company, moved to compel medical records from TeamHealth associated with health insurance claims. See complaint filed on December 10, 2020 in *Celtic Ins. Co. v. Team Health Holdings, Inc*., No. 3:20-cv-00523-DCLC-HBG (E.D. Tenn.). There, in the numerous health insurance claims that TeamHealth submitted, TeamHealth represented that its doctor-contractors performed the service nearly 100% of the time. An analysis of claims, however,

14

showed that normally a doctor provided services only 82% of the time, and a physician's assistant provided the service the remaining 18% of the time.

45.    In the instant case, during the pertinent times, by making similar misrepresentations, TeamHealth submitted insurance claims resulting in overpayments by Plaintiffs.  As a result of TeamHealth's upcoding, Plaintiffs paid TeamHealth more than was warranted on claims. Had TeamHealth assigned billing codes that accurately reflected the services provided, Plaintiffs would have paid less.

      **c.**     **TeamHealth's Critical Care Scheme.**

46.    In the Celtic litigation, discussed above, Celtic also found that TeamHealth systematically upcoded health insurance claims that TeamHealth billed at the highest and most expensive ER code. Celtic determined that TeamHealth billed routine services that TeamHealth's healthcare contractors provided, at the highest ER medical billing codes, even when the patients required only straightforward and minimal treatment. For example, patients complaining of headaches, fevers, bug bites, and other relatively minor symptoms were upcoded resulting in health insurance claims billed at the most expensive ER billing codes.

47.    TeamHealth billed Celtic for ER "critical care" CPT codes that were not warranted. Critical care CPT codes are reserved for rare situations in which there is a high probability of sudden, clinically significant, or life-threatening deterioration in the patient's condition, which requires the highest level of physician preparedness to intervene urgently. Critical care codes command a higher payment than even the most expensive standard ER code.

48.    TeamHealth was sued for upcoding standard ER services to "critical care" billing codes in a *qui tam* case; see Second Amended Complaint filed on September 19, 2019 in *United*

*States ex rel. Hernandez v. Team Health, Inc.*, No. 2:16-CV-00432-JRG, 2020 WL 731446 (E.D. Tex.) (ECF No. 83). The whistleblowers in that case alleged internal emails and presentations by TeamHealth executives encouraging employees to bill for critical care codes. However, few situations meet the CMS definition for "critical care," and CMS requires individualized assessment of each presenting condition to see whether it fulfills the criteria for critical care.

49. TeamHealth's inflated coding profits from the fact that many Americans use emergency rooms to address all sorts of concerns that do not present emergent situations. Based on a 2017 survey, there were approximately 43 ER visits per 100 persons in the U.S. each year. Of those visits, approximately 28 percent were "semiurgent" or "nonurgent." That reality gives TeamHealth ample opportunity to upcode and get paid as if most of its patients have life-threatening emergencies when in fact they often need more routine medical services.

50. As a result of TeamHealth's Critical Care Scheme upcoding, Plaintiffs have paid TeamHealth more than was warranted on claims. Had TeamHealth assigned billing codes that accurately reflected the services provided, Plaintiffs and class members would have paid less.

## V.   CLASS ACTION ALLEGATIONS.

51. Plaintiffs bring this action on behalf of themselves and all others similarly situated under Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2) and (b)(3), as representative of a class defined as follows: **All self-funded payers that compensated TeamHealth or an entity billing on its behalf for medical treatment in the United States or its territories during the four years prior to the filing of the Complaint in this action.**

52. Members of the class are so numerous and geographically dispersed that joinder of all is impracticable. TeamHealth enters into agreements with and bills services to numerous self-

16

funded plans throughout the state and nation and in conjunction with those medical coverage plans provides medical services to numerous patients each year in hospitals across the country. Thus, joinder of all members is clearly impracticable.

53.     The class is readily identifiable from information and records in the possession of TeamHealth.  Further, Plaintiffs' claims are typical of the claims of the members of the class. Plaintiffs and all members of the class were damaged by the same wrongful conduct, i.e., Plaintiffs and all members of the class had enrollees who received treatment from a TeamHealth staffer and were billed artificially inflated prices for the services received.

54.     Plaintiffs will fairly and adequately protect and represent the interests of the class. The interests of Plaintiffs are coincident with, and not antagonistic to, those of the other members of the class.  Class counsel representing the Plaintiffs are experienced in class action litigation.

55.     Questions of law and fact common to the members of the class predominate over questions that may affect only individual class members. TeamHealth has acted on grounds generally applicable to the entire class, thereby making overcharge damages with respect to the class as a whole appropriate.

56.      Questions of law and fact common to the class include, but are not limited to:  (a) Whether TeamHealth engaged in one or more fraudulent, unfair, or deceptive schemes or courses of conduct by "upcoding" and billing prices above lawful and proper amounts and rates;  (b) Whether Plaintiffs and class members have conferred benefits on TeamHealth such that they are entitled to restitution for payments above the quantum meruit value of TeamHealth's services;  (c) Whether the TeamHealth enterprise acted under a common purpose of profiting from inflated billing;  (d) Whether TeamHealth engaged in a pattern of deceptive or fraudulent activity intended

17

to defraud or deceive Plaintiffs and class members; (e) Whether TeamHealth organized a series of subsidiary companies to avoid state corporate practice of medicine laws; (f) Whether TeamHealth's avoidance of corporate practice of medicine laws allowed it to maintain its fraudulent scheme; (g) Whether the TeamHealth enterprise and its unlawful upcoding and other practices constituted an "enterprise" under RICO; (h) Whether TeamHealth violated RICO; (i) Whether TeamHealth is liable to Plaintiffs and class members for damages for conduct actionable under the Tennessee state consumer protection statute; (j) Whether TeamHealth is liable to plaintiffs and the class members for damages or restitution flowing from Defendants' misconduct; and (k) Whether equitable, declaratory or injunctive relief is warranted.

57. Plaintiffs and members of the class have all suffered, and will continue to suffer, harm and damages as a result of TeamHealth's unlawful and wrongful conduct.

58. A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3). Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.

59. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this action. Absent a class action, most members of the class likely would find the cost of litigating their claims to be prohibitive and will have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in

18

that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

60. Additionally, TeamHealth has acted and failed to act on grounds generally applicable to plaintiffs and the class and require court imposition of uniform relief to ensure compatible standards of conduct toward the class, thereby making appropriate equitable relief to the class as a whole within the meaning of Rules 23(b)(1) and (b)(2).

61. Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### COUNT I
### RACKETEER INFLUENCED AND CORRUPT
### ORGANIZATIONS ACT

62. Plaintiffs incorporate by reference the allegations in paragraphs 1 through 61 as if fully set forth herein.

63. RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

64. RICO also provides: "Any person injured in his business or property by reason of a violation of [18 U.S.C. § 1962] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]"

19

65.     Plaintiffs are each a "person" within the meaning of 18 U.S.C. §§ 1961(3) & 1964(c).  Defendants are each a "person" within the meaning of 18 U.S.C. § 1961(3).

66.     A RICO "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  For purposes of this Complaint, the relevant enterprise is an association in fact, consisting of: (a) TeamHealth; (b) TeamHealth's direct regional subsidiaries; (c) the individual corporations and other legal entities that employ and/or contract with the healthcare contractors whose services TeamHealth sells, and which TeamHealth either indirectly owns through its regional subsidiaries or controls de facto.

67.     Both Defendants have an existence separate and distinct from the TeamHealth enterprise, in addition to directly participating in and acting as a part of the enterprise.

68.     Although the various components of the enterprise play different roles, they all serve a common purpose: allowing TeamHealth to submit fraudulently upcoded health insurance claims to insurers, and to keep the difference between the amount received as a result of the upcoded claim, and the amount that would have been received had the claim been properly coded.

69.     The front-line healthcare workers employed as independent contractors by the TeamHealth enterprise's corporate subsidiaries or de facto controlled affiliates provide medical services to patients in emergency rooms.

70.     TeamHealth's numerous subsidiaries and affiliates have a mixture of corporate ownership structures. Some of TeamHealth's affiliates are wholly owned by TeamHealth; others are partially owned by TeamHealth; and some are wholly owned by others.

20

71.     Without these corporations and the healthcare contractors who provide services, the enterprise would have nothing to upcode. The enterprise's regional subsidiaries oversee the entities employing or contracting with healthcare contractors, and they negotiate contracts with hospitals as conduits of the enterprise. Without the regional subsidiaries and the hospitals through which subsidiaries deploy its healthcare contractors, the enterprise's healthcare contractors would have no patients to service, and TeamHealth's ability to efficiently coordinate and direct the activities of the corporations employing the healthcare contractors would be diminished.

72.     TeamHealth coordinates the entire enterprise; performs the upcoding; employs the staff that receives medical records from TeamHealth's healthcare contractors; and applies CPT codes to those records in accordance with policies dictated by TeamHealth.

73.     The organization of the enterprise, and specifically its use of subsidiaries and purported independent contractors rather than direct employment of healthcare contractors, facilitates the enterprise's fraudulent upcoding scheme in two ways.

74.     First, if TeamHealth directly employed all of the healthcare contractors controlled by it, or if it directly owned all the corporate practice groups that provide services on its behalf, TeamHealth would violate various state laws prohibiting the corporate practice of medicine.   The enterprise's structure is therefore essential to its functioning and to its ability to control and profit from healthcare providers who appear to patients and the public to be independent.

75.     Second, by operating through subsidiaries and other entities that have other names, TeamHealth creates an impression that patients have received services from a local doctors' group.

76.     TeamHealth almost never bills patients or insurance companies under its own name. This creates the illusion that its healthcare contractors are providing care that is locally

21

owned and directed. This illusion disguises the truth and makes TeamHealth's fraud more difficult to detect, because it submits upcoded and inflated health insurance claims under the names of dozens of different corporate entities, with no indication that they are affiliated with TeamHealth.

77. This illusion also helps protect TeamHealth politically and to insulate its activities, including by avoiding public scrutiny for the thousands of lawsuits it has filed under various corporate names against individuals and insurance companies.

78. As the topmost corporate entity of what it calls the "TeamHealth system," TeamHealth conducts and directs the TeamHealth enterprise and sets policies that govern the functioning of all components of the enterprise. TeamHealth is responsible for the actual upcoding, which occurs after its healthcare contractors submit medical records that document the actual services provided to the patient. TeamHealth uses those medical records and improperly exaggerates the services they reflect, consistent with TeamHealth's procedures, in order to submit a massive number of "upcoded" health insurance claims to insurance companies.

79. RICO prohibits the conduct of an enterprise "through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Racketeering acts are defined at 18 U.S.C. § 1961(1) and include mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.

80. TeamHealth, through its enterprise, has committed numerous acts of mail fraud and wire fraud. Specifically, Team Health has conducted a scheme to defraud insurers and self-funded plans with specific intent to obtain money from them by materially false and fraudulent representations, and to use the mails and interstate wires in furtherance of the scheme.

81. Central to TeamHealth's scheme to defraud is the systematic upcoding of medical services provided to insured patients by healthcare contractors that are under TeamHealth's

control. TeamHealth's upcoding scheme misrepresents the nature of the services provided to Plaintiffs' enrollees, for the purpose of recovering more money from Plaintiffs and from patients.

82.     Because Plaintiffs do not have access to the underlying medical records that form the basis of TeamHealth's health insurance claims, and because of the massive volume of health insurance claims, they rely on TeamHealth's representations regarding the nature of the services.

83.     TeamHealth's scheme has been carried out with the specific intent to defraud Plaintiffs and others who are similarly situated. The evidence indicates that TeamHealth has submitted a proportion of health insurance claims to Plaintiffs and others who are similarly situated under the highest CPT code for services by its healthcare contractors, and a proportion of its claims for services by doctors as opposed to physician's assistants, that renders many of the claims false.

84.     Instances of upcoding in TeamHealth's health insurance claims are not mere isolated incidents, but instead are part of a pattern and practice of upcoding intended to increase TeamHealth's revenue and profits.

85.     The fact that TeamHealth's coding is conducted at a centralized location, under the oversight of TeamHealth management, further demonstrates that TeamHealth's numerous upcoded health insurance claims are not a matter of mere coincidence.

86.     TeamHealth has used the mails and interstate wires in furtherance of its upcoding scheme to defraud Plaintiffs and others who are similarly situated in a number of ways, including: (a) Mail and wire receipt of medical records from TeamHealth-affiliated hospitals located throughout the country at TeamHealth's coding operations facility in Tennessee;  (b) Mail and wire transmission of fraudulently upcoded health insurance claims from Tennessee to self-funded plans, including Plaintiffs and class members, in numerous states throughout the country; (c) Mail

and wire transmission of marketing materials to hospitals in order to sell TeamHealth's staffing services and expand the scope of the enterprise; (d) Mail and wire receipt of money from insurers, TPAs and self-funded plans, including Plaintiffs and class members, in various states, representing the unlawful proceeds of TeamHealth's upcoding scheme; (e) Mail and wire communications between TeamHealth and its regional subsidiaries and provider groups in various states.

87.    TeamHealth's repeated acts of racketeering activity form a "pattern" under RICO because they occurred within ten years of each other, were continuous, and are related. Through its many mailings and wire communications in furtherance of its scheme to defraud, TeamHealth has committed numerous acts of racketeering activity.

88.    These acts are part of a common scheme and have the same purpose: to extract greater payments from insurance companies than TeamHealth is entitled to.

89.    TeamHealth has adopted policies encouraging upcoding, and has a regular staff dedicated to coding that is trained to adhere to TeamHealth's practice of upcoding on a systematic basis. Upcoding is part of TeamHealth's regular way of doing business, and absent judicial intervention, TeamHealth will continue its upcoding scheme for as long as it remains profitable.

90.    TeamHealth's upcoding scheme has directly caused injury to Plaintiffs' business and property. Plaintiffs suffer injury each time they pay a health insurance claim in reliance on TeamHealth's coding, where the CPT code on that claim does not accurately represent the service actually provided, or where the claim represents that the service was provided by a medical doctor when the service was actually provided by a physician's assistant.

91.     Plaintiffs' damages consist of the difference between the amount that Plaintiffs paid TeamHealth on each upcoded health insurance claim, and the amount that Plaintiffs would have paid if the underlying medical services had been properly coded.

92.     By virtue of these violations of 18 U.S.C. § 1962(c), and pursuant to 18 U.S.C. § 1964(c), TeamHealth is liable to Plaintiffs for three times the damage that Plaintiffs have sustained, plus the cost of bringing this suit, including reasonable attorneys' fees.

93.     Plaintiffs also seek injunctive relief requiring TeamHealth to alter its current policies incentivizing upcoding, retrain its coding staff to properly code medical records rather than systematically upcode medical records, and submit to a regular audit of its coding practices by an independent monitor, with all costs to be paid by TeamHealth. Absent such an injunction, TeamHealth's upcoding is likely to continue.

## COUNT II
## CONSPIRACY TO VIOLATE RICO

94.     Plaintiffs incorporate by reference the allegations in each of the preceding paragraphs 1 through 93 as if fully set forth herein.

95.     The two Defendants, collectively referred to as TeamHealth, agreed with each other to pursue the schemes described above, namely, upcoding and falsely billing services provided by physician's assistants as though they were performed by a doctor, with the ultimate objective of realizing increased revenue and profits. Although Plaintiffs only learned of this conspiracy recently, it began years ago.

96.     Both Defendants took overt acts in furtherance of the conspiracy, namely, promulgating policies that required TeamHealth employee responsible for coding insurance claims to upcode those claims.

25

97.     Both Defendants knew that their policies would lead to a pattern and practice of submitting false and inflated claims to Plaintiffs and others similarly situated, for the purpose of obtaining money from those insurers by materially false and fraudulent representations, and to the use of the mails and interstate wires in furtherance of the scheme.

98.     TeamHealth's upcoding scheme has directly caused injury to Plaintiffs, who suffer injury each time the Plan pays a health insurance claim in reliance on TeamHealth's coding, where the CPT code on that claim does not accurately represent the service actually provided, or where the claim represents that the service was provided by a medical doctor when the service was actually provided by a physician's assistant. Plaintiffs' damages consist of the difference between the amount that they actually paid TeamHealth on each upcoded health insurance claim, and the amount that they would have paid if the underlying medical services had been properly coded.

99.     By virtue of these violations of 18 U.S.C. § 1962(c), and pursuant to 18 U.S.C. § 1964(c), TeamHealth is liable to Plaintiffs for three times the damage that Plaintiffs have sustained, plus the cost of bringing this suit, including reasonable attorneys' fees.

100.    Plaintiffs also seek injunctive relief requiring TeamHealth to alter its current policies incentivizing upcoding, retrain its coding staff to properly code medical records rather than systematically upcode medical records, and submit to a regular audit of its coding practices by an independent monitor, with all costs to be paid by TeamHealth. Absent such an injunction, TeamHealth's upcoding is likely to continue.

## COUNT III
## UNJUST ENRICHMENT

101.    Plaintiffs incorporate by reference the allegations in each of the preceding paragraphs 1 through 100 as if fully set forth herein.

26

102.    Plaintiffs have repeatedly conferred benefits on TeamHealth, namely, payment for services purportedly rendered by TeamHealth to Plaintiffs' health care coverage enrollees. TeamHealth received and appreciated those benefits; it was aware that Plaintiffs were making payments to it for services purportedly rendered.

103.    Retention of this benefit by TeamHealth would be unjust and inequitable, because the amount of the payment in many cases greatly exceeds the value of the service for which it was supposedly made, namely, provision of medical services to Plaintiffs' enrollees.

104.    Plaintiffs are not in contractual privity with TeamHealth. There is therefore no means for Plaintiffs to secure contractual recovery of the benefits they have conferred on TeamHealth. Any attempt to seek recovery of Plaintiffs' losses from the parties with whom Plaintiffs are in contractual privity, i.e., Plaintiff's enrollees, would be unjust because the enrollees who seek treatment in emergency rooms have little control over which ER doctor they see and have no control over how their claims are coded, and neither the patients nor the hospitals receive the overpayment that TeamHealth extracted from Plaintiffs via its coding schemes.

## DEMAND FOR JURY TRIAL

Plaintiffs requests a jury trial of all issues properly triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

1. Certify the matter as a class action;

2. Appoint Plaintiffs as the class representatives and appoint the undersigned counsel to be class counsel herein;

3. Enter judgment in favor of Plaintiffs on all counts of this Complaint;

4. Award Plaintiffs and class members money damages, including compensatory damages and punitive/exemplary damages, in an amount to be proven at trial, of at least $5,000,000, including but not limited to any applicable award of treble damages pursuant to RICO, 18 U.S.C. § 1965(c), or as otherwise permitted by law;

5. Enter a permanent injunction requiring TeamHealth to alter its current policies regarding upcoding, retrain its coding staff to properly code medical claims rather than systematically upcode medical claims, and submit to a regular audit of its coding practices by an independent monitor, with all costs to be paid by TeamHealth;

6. Award Plaintiffs and class members their costs, expenses, and reasonable attorney's fees incurred in this action as permitted by law;

7. Award Plaintiffs and class members all pre- and post-judgment interest to the maximum extent permitted by law; and

8. Award such other relief as this Court deems just and proper.

28

Dated:  June 5, 2021.

/s/ Mary A. Parker
Mary A. Parker (TN Bar No. 06016)
PARKER & CROFFORD
5115 Maryland Way
Brentwood, TN 37027
615-244-2445 Tel
615-255-6037 Fax
mparker@parker-crofford.com

Mona L. Wallace (N.C. Bar No. 09021)
John S. Hughes (N.C. Bar No. 22126)
WALLACE & GRAHAM, P.A.
525 N. Main St.
Salisbury, NC 28144
704-633-5244 Telephone
mwallace@wallacegraham.com
jhughes@wallacegraham.com

Janet Varnell, Esq. (FL Bar No. 0071072)
VARNELL AND WARWICK, P.A.
1101 E. Cumberland Ave.
Suite 201H, #105
Tampa FL 33602
Tel.: (352) 753-8600
jvarnell@vandwlaw.com

*Attorneys for Plaintiffs*